IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:11cr16 |
| | ) | |
| JOSHUA BRANDON MAJOR | ) | |

MEMORANDUM OPINION

In this criminal prosecution, defendant pled guilty pursuant to a written plea agreement to one count of conspiracy to distribute N-Benzylpiperazine (BZP), in violation of 21 U.S.C. §§ 841 and 846, and one count of possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). The subsequent sentencing proceedings presented two significant issues requiring resolution, namely (i) the appropriate guidelines analysis for a drug offense involving BZP, a Schedule I controlled substance that is not specifically referenced in the guidelines, and (ii) whether defendant's three prior convictions for statutory burglary under Virginia law constituted predicate "violent felon[ies]" under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(1), thus mandating a minimum fifteen-year custody sentence in this case. Following extensive briefing and oral argument, defendant was ultimately sentenced to concurrent sentences of three years on the drug conspiracy charge and fifteen years on the firearm charge, the mandatory minimum required under the ACCA. Recorded here are the reasons underlying the BZP and ACCA rulings made in the course of the sentencing proceedings.

I.

The starting point in the BZP analysis is, of course, the language of the guidelines themselves. In this regard, it is undisputed that BZP is a controlled substance that "is not

specifically referenced" in the guidelines. U.S.S.G. § 2D1.1 cmt. n. 5. In that circumstance, the guidelines direct sentencing courts to "determine the base offense level using the marihuana equivalency of the most closely related controlled substance referenced" in the guidelines. *Id.* And, in determining the most closely related controlled substance, sentencing courts are advised to consider the following factors:

> **(A)** Whether the controlled substance not referenced in this guideline has a chemical structure that is substantially similar to a controlled substance referenced in this guideline.
>
> **(B)** Whether the controlled substance not referenced in this guideline has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance referenced in this guideline.
>
> **(C)** Whether a lesser or greater quantity of the controlled substance not referenced in this guideline is needed to produce a substantially similar effect on the central nervous system as a controlled substance referenced in this guideline.

*Id.*

Despite the fact that BZP has been, and continues to be involved in criminal prosecutions across the country, it appears the Sentencing Commission has not yet advocated a formal position concerning "the most closely related controlled substance" to BZP for purposes of the guidelines analysis. This being the case, sentencing courts must rely on published literature and chemical studies conducted by other external sources, such as the Drug Enforcement Administration (DEA). In this regard, the DEA's website expressly states that "the pharmacological effects of BZP are qualitatively similar to those of amphetamine." *N-Benzylpiperazine (Street Names: BZP, A2, Legal E or Legal X)*, http://www.deadiversion.usdoj.gov/drugs_concern/bzp_tmp/bzp_tmp.htm (last visited July 26,

2011) (emphasis added).[1]

The DEA's conclusion that BZP is "most closely related" to amphetamine for purposes of the guidelines analysis is consistent with recent judicial decisions from other circuits. *See, e.g., United States v. Rose*, 722 F. Supp. 2d 1286, 1289 (M.D. Ala. 2010) (stating that "[o]n its own, BZP is like amphetamine in that it is a central-nervous-system stimulant, although it is ten to 20 times less potent"). Other courts have also sensibly recognized that the fact that BZP is significantly less potent than amphetamine is an issue to be considered, not in determining the applicable base offense level under the guidelines, but instead in determining whether a variance from the advisory guidelines range is warranted in light of the factors set forth in 18 U.S.C. § 3553(a). *See id.* at 1291 (recognizing that defendant was entitled to a variance under § 3553(a), in part "[b]ecause the diminished potency of BZP . . . was not accounted for in calculating [defendant's] offense level").

---

[1] More specifically, the DEA's website provides the following concerning BZP:

> Both animal studies and human clinical studies have demonstrated that the pharmacological effects of BZP are qualitatively similar to those of amphetamine. BZP has been reported to be similar to amphetamine in its effects on chemical transmission in brain. BZP fully mimics discriminative stimulus effects of amphetamine in animals. BZP is self-administered by monkeys indicating reinforcing effects. Subjective effects of BZP were amphetamine-like in drug-naive volunteers and in volunteers with a history of stimulant dependence. BZP acts as a stimulant in humans and produces euphoria and cardiovascular effects, namely increases in heart rate and systolic blood pressure. BZP is about 10 times less potent than amphetamine in producing these effects in subjects with histories of amphetamine dependence. Experimental studies demonstrate that the abuse, dependence potential, pharmacology and toxicology of BZP are similar to those of amphetamine. Public health risks of BZP are similar to those of amphetamine.

*Id.*

In this case, using amphetamine as the most closely related drug to BZP results in a guidelines base offense level of 18 for defendant's drug conspiracy offense. Specifically, where, as here, the weight of the controlled substance is unknown, sentencing courts are directed to "multiply the number of doses, pills, or capsules by the typical weight per dose . . . to estimate the total weight of the controlled substance." U.S.S.G. § 2D1.1 cmt. n. 11. Here, the record reflects — and defendant admitted in his sworn statements of facts — that he is accountable for a total of 1,000 pills containing a detectable amount of BZP. *See United States v. Major*, 1:11cr16 (E.D. Va. Mar. 4, 2011) (Statement of Facts, ¶ 15) (providing that "the defendant was personally involved in the distribution of, and it was reasonably foreseeable to the defendant that the co-conspirators distributed 1,000 pills containing a detectable amount of N-Benzylpiperazine"). This quantity of pills, multiplied by the typical weight per dose of amphetamine results in an estimated weight of 10 grams of amphetamine. *See* U.S.S.G. § 2D1.1 cmt. n. 11 (providing that the typical weight per dose of amphetamine is 10 milligrams). Ten grams of amphetamine, in turn, equates to 20 kilograms of marijuana under the guidelines' equivalency table, resulting in a base offense level of 18 pursuant to U.S.S.G. § 2D1.1(c) (providing a base offense level of 18 for "[a]t least 20 KG but less than 40 KG of Marihuana"). Two additional levels were then added to this base offense level pursuant to U.S.S.G. § 2D1.1(b)(1), based on defendant's possession of a firearm, resulting in an adjusted offense level of 20 for the drug conspiracy charge.

As it happens, however, the BZP analysis and the resulting guidelines calculations were not ultimately determinative of defendant's final guidelines range of imprisonment given the higher offense level applicable to the related firearm offense. In this regard, the base offense level applicable to defendant's § 922(g) firearm offense was 20, pursuant to U.S.S.G. § 2K2.1(a)(4). Four levels were then added to this base offense level under § 2K2.1(b)(6) as a

result of defendant's possession of the firearm in connection with another felony offense — namely, the BZP conspiracy charge. These calculations resulted in an adjusted offense level of 24 for defendant's § 922(g) firearm offense. Thus, prior to any consideration of ACCA, application of the guidelines' grouping provisions set forth in U.S.S.G. § 3D1.2(c) resulted in a combined adjusted offense level of 24 for defendant's drug and firearm charges.

II.

Of course, the most significant question presented in the course of the sentencing proceedings was whether the ACCA mandated a minimum fifteen-year custody sentence on defendant's § 922(g) conviction. The ACCA provides, in pertinent part, that any person convicted of unlawful possession of a firearm who has "three previous convictions by any court . . . for a violent felony or a serious drug offense, or both, committed on occasions different from one another . . . shall be fined under this title and imprisoned not less than fifteen years." 18 U.S.C. § 924(e)(1). In this case, the government sought application of ACCA's enhanced penalty provisions based on three statutory burglary convictions from the Fairfax County Circuit Court, all from 1998 when defendant was 18 years old. Although defendant, by counsel, zealously contested application of the ACCA to the instant circumstances, a careful review of the record, as it existed at the time of the final sentencing hearing, ultimately revealed that ACCA's fifteen-year term of imprisonment was mandatory in this case.

To begin the analysis, ACCA defines the phrase "violent felony" as

> any crime punishable by imprisonment for a term exceeding one year . . . that— **(i)** has as an element the use, attempted use, or threatened use of physical force against the person of another; or **(ii)** is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another . . ..

5

18 U.S.C. § 924(e)(2)(B). In determining whether a particular prior conviction constitutes a qualifying predicate ACCA conviction, sentencing courts must first apply the categorical approach. Under this approach, "a federal sentencing court may look only to the fact of conviction and the statutory definition of the offense of conviction to determine whether the offense is a 'serious drug offense' or a 'violent felony' under the ACCA." *United States v. Harcum*, 587 F.3d 219, 222 (4th Cir. 2009) (citing *United States v. Shepard*, 544 U.S. 13, 17 (2005); *United States v. Taylor*, 495 U.S. 575, 600-02 (1990)). Yet, it is well-settled that the categorical approach "does not always reveal the nature of the asserted predicate offense encountered by a sentencing court." *Harcum*, 587 F.3d at 223. Thus, "a sentencing court is entitled, in the proper circumstances, to go beyond the scope of the categorical approach and assess the underlying charging documents" or other specifically-approved documents or materials to ascertain whether the offense qualifies as an ACCA predicate offense. *Id.* (citing *Taylor*, 495 U.S. at 602).

The Supreme Court held definitively in *Taylor* that an offense constitutes "burglary" for purposes of the ACCA provisions if either (i) "its statutory definition substantially corresponds to 'generic' burglary," or (ii) "the charging paper and jury instructions actually required the jury to find all the elements of generic burglary in order to convict the defendant." *Taylor*, 495 U.S. at 602. *Taylor* further held that a "generic" burglary for purposes of ACCA is "any crime, regardless of its exact definition or label, having the basic elements of unlawful, or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime." *United States v. Taylor*, 495 U.S. 575, 599 (1990).

*Taylor*, of course, was decided in the context of a prior jury conviction. Fifteen years later, in *Shepard*, the Supreme Court expanded *Taylor*'s modified categorical approach to cases involving guilty pleas, as presented here. In the plea context, *Shepard* teaches that:

> enquiry under the ACCA to determine whether a plea of guilty to burglary defined by a nongeneric statute necessarily admitted elements of the generic offense is limited to the terms of the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to some comparable judicial record of this information.

*Shepard*, 544 U.S. at 26. Put simply, *Taylor* and *Shepard*, read together, hold that

> without a charging document that narrows the charge to generic limits, the only certainty of a generic finding lies in jury instructions, or bench-trial findings and rulings, or (in a pleaded case) in the defendant's own admissions or accepted findings of fact confirming the factual basis for a valid plea.

*Id.* at 25.

It is well-settled that "[t]he Government bears the burden of proving an ACCA predicate offense by a preponderance of the evidence." *Harcum*, 587 F.3d at 222 (citations omitted). As previously noted, the government sought application of the ACCA here based on defendant's three 1998 convictions in the Fairfax County Circuit Court for statutory burglary, in violation of Va. Code § 18.2-91. The record reflects that defendant pled guilty to all three statutory burglary charges in a single plea hearing, and he was later sentenced to concurrent sentences on each of the convictions in a single sentencing hearing. It is undisputed that settled authority provides that each of the three convictions is nonetheless considered a separate conviction for purposes of the ACCA analysis, as each underlying burglary was committed on a different occasion.[2] Each

---

[2] *See, e.g., United States v. Hobbs*, 136 F.3d 384, 388 (4th Cir. 1998) (recognizing that convictions will be considered as having occurred on "occasions different from one another" under the ACCA if each "arose out of a separate and distinct episode . . . that can be isolated

burglary must therefore be analyzed separately to determine whether it is a qualifying predicate "violent felony" under ACCA.

An examination of the charging statute — Va. Code § 18.2-91 — makes clear that Virginia's statutory burglary offense does not, by definition, "substantially correspond[] to 'generic' burglary." *Taylor*, 495 U.S. at 602. Rather, the scope of the applicable Virginia statute is substantially broader than a generic burglary statute, as it encompasses conduct involving burglaries of places other than a generic "building or structure," including "any ship, vessel or river crafts or any railroad car, or any automobile, truck or trailer, if such automobile, truck or trailer is used as a dwelling or place of human habitation." Va. Code § 18.2-91 (incorporating language of Va. Code § 18.2-90). Given the broad scope of the Virginia statute, it is necessary in this instance to engage the *Taylor/Shepard* modified categorical approach and look beyond the language of the charging statute to certain other approved documents to determine whether defendant's statutory burglary convictions constitute qualifying predicate convictions under ACCA. 18 U.S.C. § 924(e)(1).

The first of the three convictions at issue involves a burglary that occurred in Fairfax County, Virginia on March 11, 1998. The government produced multiple court documents from the Fairfax County Circuit Court concerning this conviction, including (i) the indictment, (ii) the signed plea agreement, (iii) the sentencing order, and (iv) the plea and sentencing transcripts.[3]

---

with a beginning and an end"); *United States v. Deroo*, 304 F.3d 824 (8th Cir. 2002) (holding that three burglaries that occurred "within an hour of one another" were separate crimes for purposes of ACCA because the burglaries "involved breaking into three separate homes . . . and unrelated victims who suffered individual losses of varying types of property").

[3] Although the government also submitted, for each of the three subject burglaries, the underlying arrest warrants issued against defendant in the Fairfax County General District Court, these documents are not appropriately considered in the ACCA analysis, as they originated from a court different from the court of conviction. *See Harcum*, 587 F.3d 219 (recognizing that

8

The indictment filed in that case specifically charged defendant with statutory burglary, in violation of Va. Code § 18.2-91, as follows:

> On or about the 11th day of March, 1998, in the County of Fairfax, Joshua B. Tart[4] did break and enter the dwelling house of Mary Hopkins and Eileen Merton, 3963 Rosebay Court, Fairfax, Virginia, with the intent to commit larceny . . ., [in violation of] Va. Code § 18.2-91.

Defendant pled guilty to this statutory burglary charge on September 16, 2008, and was thereafter sentenced on November 13, 1998 to three years of incarceration, with all but twelve months suspended, with this term ordered to run concurrently with identical sentences imposed in the two related burglary cases discussed *infra*. A review of the plea transcript — which is undoubtedly a *Shepard*-approved document for purposes of the ACCA analysis — reveals that defendant, by his own admission, broke into the Rosebay Court residence "through a basement window" and took various personal items from the residence, including jewelry, CDs, money, a camera and a television. Plea Transcript at 11. Because the presence of a basement window in this recitation of facts necessarily implicates an attached "building or structure," defendant sensibly conceded in the course of the final sentencing hearing that this first burglary indeed meets *Taylor*'s definition of a generic burglary. *Taylor*, 495 U.S. at 599 (defining a generic burglary as an "unlawful, or unprivileged entry into, or remaining in, a building or structure, with

---

*Shepard* prohibits consideration of materials outside the record of the court of conviction). Nor does the record reflect that any of the underlying warrants from the Fairfax County General District Court were ever "expressly incorporated" into any charging documents issued in the Fairfax County Circuit Court, the ultimate court of conviction. *See United States v. Simms*, 441 F.3d 313 (4th Cir. 2006) (construing *Taylor/Shepard* as allowing consideration of external materials "expressly incorporated" into a charging document, as those materials are then "part of that charging document").

[4] The record reflects that defendant legally changed his name from Joshua Brandon Tart to Joshua Brandon Major in November 2007.

9

intent to commit a crime"). It is undisputed, therefore, that the Rosebay Court burglary constitutes a valid predicate conviction under ACCA.

The analysis is slightly different with respect to the second and third burglaries at issue. In both of those cases, there was no indictment or other charging document in the Fairfax County Circuit Court. Nor do the plea agreements or sentencing orders from those cases shed any light on the specific facts underlying either of those convictions, other than the date of the respective burglary — March 4, 1998, and April 3, 1998. Thus, it is again necessary to rely on the factual assertions agreed to by defendant in the course of the plea hearing before the Fairfax County Circuit Court. In this regard, defendant acknowledged that on each of these two occasions, he broke into a "dwelling," "house" or "residence," without the permission or consent of the owners, and took various personal items from the residences. Plea Transcript at 11-13. Specifically, during the daytime of March 4, 1998, defendant broke into the residence of Laura Dawson, located at 3994 Gumwood Court, in Chantilly, Virginia, with the intent to commit larceny. Plea Transcript at 5, 11. In the course of this burglary, defendant took from the residence a knife collection, alcohol and $600 in cash. *Id.* at 11, 13. Approximately one month later, during the nighttime of April 3, 1998, defendant broke into the residence of Roger Early, located at 4108 Plaza Lane in Fairfax, Virginia, again with the intent to commit larceny. *Id.* On that occasion, defendant entered the dwelling through a "rear window" and took a shotgun from the residence. *Id.* at 13.

Defendant correctly argues that nothing appears in the plea transcript — or any other *Shepard*-approved document — to verify that the Gumwood Court and Plaza Lane residences were necessarily "buildings or structures" attached to the ground, as opposed to moveable residential trailers, for example. *Taylor*, 495 U.S. at 599 (defining a generic burglary as an

"unlawful, or unprivileged entry into, or remaining in, *a building or structure*, with intent to commit a crime") (emphasis added). Because of this, the second and third burglaries at issue, unlike the first burglary, do not categorically meet the definition of "generic" burglary within the meaning of *Taylor*.

Yet, this still does not end the analysis, for the second and third burglaries nonetheless constitute "violent felon[ies]" under ACCA's residual clause because each burglary "involve[d] conduct that present[ed] a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B). Indeed, the record reflects, and defendant admitted in the course of the underlying plea hearing before the Fairfax County Circuit Court, that each of these burglaries involved a residential house or dwelling. And, as the Supreme Court has recognized, conduct directed toward unlawfully entering a dwelling, with the intent to commit a felony therein, necessarily "presents a serious potential risk of physical injury to another." *See, e.g., James v. United States*, 550 U.S. 192 (2007) (holding that attempted burglary under Florida statute qualified as a predicate "violent felony" because overt conduct directed toward unlawfully entering or remaining in a dwelling, with the intent to commit a felony therein, is "conduct that presents a serious potential risk of physical injury to another" within the meaning of ACCA's residual clause).[5] Both the second and third statutory burglary convictions at issue thus constitute qualifying "violent felon[ies]" under ACCA's residual clause.

---

[5] Defendant's argument that nothing in the plea colloquy reveals that the second and third burglaries involved occupied dwellings, as opposed to non-occupied dwellings, is far-fetched and wholly unpersuasive, particularly given defendant's admissions during the course of the colloquy concerning the named residents of each dwelling, as well as the specific personal belongings, including cash, taken from each residence.

11

III.

In the circumstances, therefore, the government met its burden of establishing three qualifying predicate convictions under ACCA, thus mandating a minimum fifteen-year custody sentence in this case. *See* 18 U.S.C. § 924(e)(1) (requiring a term of imprisonment of "not less than fifteen years" for any person convicted of unlawful possession of a firearm under § 922(g) that has three previous convictions by any court ""for a violent felony"). Following consideration of the various sentencing factors set forth in 18 U.S.C. § 3553(a), defendant was ultimately sentenced to concurrent terms of imprisonment of three years on the drug conspiracy charge, and fifteen years on the § 922(g) firearm charge, to be followed by three years of supervised release.

An appropriate Judgment has already issued in this case.

/s/
————————————————
T. S. Ellis, III
United States District Judge

Alexandria, VA
August 1, 2011